[No. 3516.]

## O. A. WELLS v. THE STATE.

1. UNLAWFUL SALE OF LIQUORS — OCCUPATION TAX — EVIDENCE.— See the statement of the case for evidence *held* insufficient to support a conviction for selling spirituous liquors in quantities less than one quart, without license; and the opinion of the court for the reason why.

2. SAME.— To sustain a conviction under a prosecution of this character, it must appear that the accused pursued, followed, and was engaged in the occupation of selling spirituous liquors in quantities less than one quart, without having first obtained license so to do.

APPEAL from the County Court of Johnson. Tried below before the Hon. B. D. Simpson, County Judge.

The conviction in this case was for pursuing the occupation of selling intoxicating liquors in quantities less than one quart, without first having obtained license so to do and paid the taxes therefor. A fine of $450 was the penalty imposed by the jury.

R. Beal was the first witness for the State. He testified that he lived in the town of Cleburne, Texas, and owned the building in which the "Craddock" saloon business was conducted. He rented that building to W. B. Anderson in June, 1884. Anderson paid the rent up to December, 1884. On or about the 2d day of December, 1884, witness called on Anderson for the rent for that month. Anderson told witness that the defendant would pay it. Anderson took witness into the saloon and introduced him to the defendant. Defendant told witness to call the next day and get his rent. Witness called as directed, and defendant paid him for the month of December. On the 2d day of January defendant gave the witness a draft on Straus & Levy of Dallas, Texas, for the January rent.

W. B. Anderson was the next witness for the State. He testified that the defendant had charge of the "Craddock" saloon in Cleburne, Texas, and from about November 10, 1884, to January 6, 1885, sold liquors in quantities less than one quart.

Cross-examined, the witness testified that he took charge of the Craddock saloon in June, 1884, under the following circumstances: He was in debt to Straus & Levy of Dallas, Texas, and applied to them to start him in business. They made a trade with Mr. Craddock for the Craddock saloon in Cleburne, which trade, however, was not completed until in September, and witness ran the saloon under Craddock's license until the said September. When Straus and Levy made the trade with Craddock for witness they took from

the witness a deed of trust on the saloon. This was in June, 1884. Witness took out his license in November, 1884, which license ran from September 19, 1884, until September 19, 1885. Witness managed the business until fall, when he got sick and wrote Straus & Levy. Straus & Levy put a young man named Levy in charge until witness got well. Early in November witness wrote to Straus & Levy, asking one or the other to come to Cleburne. Mr. Levy came and said that the saloon was not panning out as well as it should, and proposed to place it in other hands. Witness told him to do as he liked. Levy then said that if the witness would consent he would appoint some one to conduct the business as witness's agent. Witness replied to this suggestion that he, Mr. Levy, could do just as he thought best about it. With reference to the power of attorney executed by J. J. Levy to O. A. Wells, as agent of W. B. Anderson, on the 8th day of November, 1884, the witness said, the same being shown to him, that he had seen it before. He saw it in the possession of the defendant while he was in charge of the saloon. Witness did not execute it himself, and was not present when it was executed. He did not specially authorize Levy to appoint the defendant to conduct that business, but told him he could do as he pleased and appoint anybody that he pleased. Defendant took charge of the saloon on November 10, 1884, and continued to run it until January 6, 1885, when witness again took charge, and still has charge.

All the goods shipped to and received by the defendant, while he was in charge of the saloon, were billed in the witness's name, except two boxes of glass, which were sent in the defendant's name. Witness took out his license on the 26th day of November, 1884, while the defendant was in charge of the saloon. He paid, if he remembered, the whole of the amount — six hundred dollars — except one hundred and fifty or two hundred dollars, for which balance he gave a draft on Straus & Levy, and they paid it. Witness took the license in his own name, in November, during defendant's management of the business, in order to avoid prosecution for selling liquor without license. Witness did not like defendant's manner of conducting the business, and complained to Levy. Witness, being under bond to keep an orderly house, feared suit upon his bond. Among other things, witness objected to the cock pit which the defendant established in the rear of the saloon.

When Levy came to Cleburne and took charge of the saloon, and before he installed the defendant, he figured up the witness's indebtedness as $2,100, the amount stated in the power of attorney to de-

fendant. Levy afterwards sent witness a statement on which this amount appeared as a credit. Witness could not say what interest he owned in the saloon after this transaction. A settlement, which had never been had, might still show either the witness or Straus & Levy in arrears. Witness did not know how his account with Straus & Levy stood on November 10, 1884, nor could he say how it stands now. Witness turned the whole business — saloon, license and all — over to Straus & Levy, and could not tell the difference between his interest now and prior to November 10, 1884. He hardly knew how he managed to get back into the saloon on January 6, 1885. He just went in and defendant stepped out. Witness was now but a clerk in the saloon, with no arrangement with Straus & Levy as to salary. Straus & Levy furnished all the goods and stock used in the business, and witness did not contribute a dollar. Witness did not sell to defendant, nor did defendant pay him anything to get into the saloon.

It was admitted that defendant retailed liquor from November 10, 1884, to January 6, 1885, under W. B. Anderson's license, the only one taken out, as the agent of W. B. Anderson or of said Anderson and Straus & Levy, and not for himself, or on his own account. The order of the commissioners' court levying the occupation tax was then introduced, and the State closed.

J. J. Levy was the first witness for the defense. He testified that he was a member of the firm of Straus & Levy, wholesale liquor dealers in Dallas, Texas. W. B. Anderson came to witness in Dallas in June, 1884, and asked him to start him in business in Cleburne. Witness went to Cleburne and bought out the Craddock saloon, for Anderson, paying therefor $1,200. He then furnished Anderson stock, etc., to the amount of $1,600. For these amounts witness took Anderson's notes, with a deed of trust on the saloon, fixtures, etc., as security. Anderson conducted the business for some time, making weekly remittances, as provided in the deed of trust, for which he was given credit, and drawing drafts which were paid by witness, and ordering goods which were furnished by witness, and the amounts of the drafts and the value of the goods were charged up against him. During the summer Anderson wrote for witness. On witness's arrival in Cleburne, Anderson told him he was sick, and advised that some one run the business until his recovery. Witness employed and put one Levy in charge. When Anderson got well, he complained of Levy, and witness discharged him, and Anderson again took charge. Again, in a short time, Anderson wrote witness that he was sick. Witness went to Cleburne and

Anderson asked him to put some one else in charge, and authorized witness to appoint any one he liked to manage the business as his, Anderson's, agent. This witness declined to do unless Anderson fully and willingly authorized him, and witness appointed the defendant by power of attorney as Anderson's authorized agent.

The business went along smoothly until Anderson got well, when he complained of the defendant, and the witness removed the defendant. In the mean time, and while Anderson was in charge of the business, Anderson took out license, to run one year from September 19, 1884, in his own name, using $300 of the saloon money, and drafting on witness's firm for the remaining $300, which was paid, to pay for the said license. Witness did not, in November, 1884, when he put Wells in charge, buy Anderson out for $2,100 or any other amount. Nothing was said about such a purchase and sale. Witness did not give Anderson credit for $2,100 when he wrote the power of attorney to defendant. That amount was put in that power of attorney because witness thought that some amount was necessary to legalize the document. Witness's one object in the transaction throughout was to get his money out of the concern. Witness never claimed any other interest in the saloon than the interest secured to him by the deed of trust. Witness still held the deed of trust, and Anderson, who never put a dollar in the business, owned just as much interest in it as he had ever owned. Defendant had never owned any interest in the concern, and his only connection with it was as agent of Anderson under witness's appointment.

The defense next introduced paid drafts on Straus & Levy, signed "W. B. Anderson, per O. A. Wells, agent," dated December 22, 1884; December 29, 1884; January 2, 1885, and January 5, 1885. Also the deed of trust from Anderson to Straus & Levy, which is in usual form, and the power of attorney to defendant, which reads as follows:

"Dallas, Tex., Nov. 8, 1884.

"In consideration of twenty-one hundred dollars, I, the undersigned W. B. Anderson, do appoint this day O. A. Wells, Esq., my agent, to run my place commonly called Craddock's saloon, until Oct. 1, 1885.

"W. B. Anderson,
"Per J. J. Levy,
"Witness: A. Straus."          "His authorized agent."

The defense then read in evidence the retail liquor dealer's license, issued to W. B. Anderson, to expire September, 1885; and the case was then closed.

The motion for new trial raised the questions discussed in the opinion.

*Poindexter & Padelford*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE.  This is a conviction for pursuing the occupation of selling spirituous, vinous and malt liquors in quantities less than one quart, without license, etc.

Defendant sold whisky in quantities less than one quart from about November 10, 1884, to about January 6, 1885.  One W. P. Anderson procured license to pursue the occupation on the 26th day of November, 1884.  The license covered the time from the 19th day of September, 1884, to the 19th day of September, 1885.

It will be observed that the period of time in which defendant Wells sold whisky was covered by Anderson's license.  The issue upon the trial was whether Wells sold the whisky as the bar tender of Anderson or as the bar tender of Straus & Levy.  If as the bar tender of Anderson, he was not guilty, as Anderson had a license to sell.  If as the bar tender of Straus & Levy, it is urged by the State that defendant is guilty, because Anderson could not transfer his license to Straus & Levy, and hence as their clerk or agent the defendant had no legal right to sell.

First, we are of the opinion that Wells was clearly shown to have been the agent or clerk of Anderson.  2. But, if there was a transfer by Anderson of the stock and saloon fixtures to Straus & Levy, it was not of such a character as would deprive Anderson of the right to pursue the occupation of selling the liquors under his license, and hence defendant, his bar tender, would not be guilty.  We are therefore of the opinion that the verdict of the jury has no support in the evidence.

His honor below instructed the jury at great length, and to us portions of his charge seem to be in conflict.  To convict the defendant the jury must believe from the evidence that defendant *pursued, followed and was engaged* in the *occupation* of *selling* spirituous liquors, etc., in quantities less than one quart.

Because the verdict is not supported by the evidence, the judgment is reversed and the case remanded.

*Reversed and remanded.*

[Opinion delivered June 10, 1885.]